In this case, this is a jail suicide case, one of the rare cases I think that reached this level. The case law that both parties have cited from a wide range of years, for many years. In this case, we think it's our position that the judge did state accurately what the law is on these cases. And it is the deliberate indifference standard. And we do acknowledge that it's higher than mere negligence. And we feel that the judge misapplied the facts in this case on summary judgment as it applies to the law. In this case, Mr. Hartwig not only did, when he entered the St. Louis County Jail, he had a prior suicide attempt at his mother's house. He was also in jail for criminal non-support. So finances was a big thing. He owed thousands of dollars in back child support. And another major problem that he had, when he was in jail, his girlfriend at the time, who was also the mother of his child, broke up with him while he was in jail. And Mr. Hartwig became upset and took the phone and beat himself in the head in the phone until he was bleeding and caused him to require stitches. A couple things too that were pretty alarming with Mr. Hartwig in these situations is he was untruthful with the staff on not only his prior suicide before he entered the jail. But he was also untruthful with the staff on how he hurt his head. He said he fell down, made up something else, that he hit himself because he knew he was going to be placed in the infirmary. Well, it seems to me that's a big hill for you to climb here, because how is this? It's easy to say in hindsight, particularly when he killed himself, that he was being untruthful when he kept denying he was suicidal. But how's the staff supposed to know that? It was in the records, Judge. They knew, they had found out about the prior suicide and asked him about it. And they knew that he was not being truthful because they had the records. They had found out about it. And also they found out about the hitting himself in the head with the phone from the girlfriend because the girlfriend was advised to tell staff what actually occurred in that phone room, because it's just the Mr. Hartwig and his girlfriend. Now, with respect to the individual defendants, we named, Dr. Magnoli was a psychologist. One of the alarming things in the notes, and we had an expert review the case, that also submitted a report that is part of the summary judgment record. Dr. Magnoli, when after Mr. Hartwig hit himself in the head, he was placed in the infirmary right away. In the notes, Dr. Magnoli stated that she was going to see Mr. Hartwig to see his readiness for discharge. So it appeared from the notes and from the records that it was a common practice to move the inmates out of the infirmary as fast as possible and back into the general population. Now, what- You think that's surprising? There isn't a hospital or an infirmary in the country that doesn't want to move people out as fast as it's medically appropriate to do so. Right, but you don't go from, but in this case, they took Mr. Hartwig instead of from, for example, the infirmary to a medium status, to a precautionary status. There's a big difference in monitoring. And what did your expert say about that, about the level of professional care from Dr. Magnoli? The, our expert opined that Dr. Magnoli failed to accurately assess the risk factors of Mr. Hartwig. And Mr. Hartwig was at least a medium risk because of the prior suicide, because of the failing to be honest about things. And his, he basically stated he wanted to see the doctor and wanted to be out of the infirmary the next day. So medium is one step more restrictive than precautionary? Yes, and there's much more monitoring. Now, the problem with the precautionary status was the only requirement under their policy for precautionary status had to have a roommate. Well, there were no restrictions that that roommate couldn't come and go. So being placed on precautionary status was pretty much no status at all being placed back in general population. In the summary judgment filings, St. Louis County admitted that after Mr. Hartwig's suicide, they changed that policy to where if the roommate left the cell, the person on precautionary status had to leave the cell as well. Is this a situation where there are cells and then a pod in the middle? So you're coming in and out of your cell into a general area? Or are you leaving the area altogether if you're leaving your cellmate? They're in pods, they're in pods. So is that door to the cell, it sounds like that door was locked because the officer had to come and let the cellmate back in. So once the cellmate leaves, he remains in his cell behind a locked door? That's correct. In that standard procedure? That was the St. Louis County standard procedure. Now, and I wanted to also talk about- But he may have been calling his mother from outside the cell, as I understand the facts. At least as they're recited in the briefs. He did make a phone call to his mother earlier. More than one, didn't he? Or more than one. What was it, a half dozen calls that day? I don't remember the records. I know he spoke to her one time. To the girlfriend and shortly before the suicide to his mother. And he had to do that outside the cell. Correct. But the other defendant in this case, it's Abate. It's A-B-A-T-E, it's pronounced Abate. The corrections officer, she had stated she didn't even remember seeing Mr. Hartwig on the day of the suicide. And she was required to do checks, hourly checks on him. And when I asked her, she said she glanced in the cell and she didn't remember seeing him at all. Well, if he had to come out of the cell to make a telephone call, an officer would have to unlock the door, right? So would that count as a check then, the hourly check? It does not, no. It doesn't? No. They just have to, I guess, alert the desk that they want to come out and they activate the door. Oh, it's from a command station or something? Correct. That they let them out from. That's correct. And then also, the corrections officer, Abate, later in the summary judgment stage process, submitted a 76-paragraph affidavit that later stated that she did remember seeing him that day. However, her deposition testimony was that she didn't remember seeing him that day. So there is some conflicting testimony with respect to the defendant, and that's very troubling at the summary judgment stage that the defendant was allowed to make such an affidavit and Judge Jackson ruled the way she did. How did she rule on that? She ruled there only a couple of seconds, two sentences that she was required to do checks, CO Abate, and she did the check. No, wait a minute. You were talking about the very troubling, I mean, I know the case law, at least generally, about affidavits that differ from depositions, and you said the trial court's ruling, that was very troubling, the trial court's ruling. So what was the ruling on that issue? The ruling was, even though they were different statements, that she, the court recognized that in her deposition testimony she said she didn't remember seeing him. Was it argued to the district court that this was an inconsistent affidavit that should not be considered? It was not inconsistent because it was made at a later time. She later remembered seeing him. It was challenged under our case law that frowns on. It was challenged. And was there a ruling by the district court? It was denied. It was separate from the summary judgment? That's correct. And is that order appealed? That is not. And just briefly, Judge, I wanted to touch on the motion to amend the ADA and the R.A. Rehabilitation Act claim. There were two denials on the basis of standing because there were no heirs named. I had to do a lot of probate research and file myself a determination of heirs of the probate in the probate court where three of the plaintiffs were the plaintiffs in the ADA or the R.A. claim. By the third time we had finally gotten the ruling from the probate court, Judge Jackson said it was too late in the case to amend, and that's how we got the second appeal is that the statute of limitations on that claim had not run, so I had filed a separate case that was assigned to Judge Perry. Now, Judge Perry had alternative grounds, the second one of which was implausibility, and you say, oh, no, this was based on social education, safety discrimination, not medical treatment decisions barred in Dinkin's case. And then I, so my question is, how is your claim substantively different from footnote two in Shelton? Regarding the federal statutory claims, we say, the appellant specifically alleges the defendants willfully and intentionally failed to place Ms. Shelton in an environment appropriate to her needs as required by the ADA and the Rehab Act. That sounds to me like your description of the claims here, and yet that was specifically ruled noncognizable in Shelton. Our complaint was if, and I do not have it in front of me to the best of my recollection, was based upon the programs and the services that were offered. It did not address the medical care of Mr. Harbert. Yeah, but Shelton had the same kind of claims, couched as nonmedical claims, and our court concluded they were, in substance, noncognizable medical treatment claims. I'm just saying, you sort of brushed aside Shelton on that basis. Well, our claims aren't medical, and then I go and read footnote two, and I just wondered if you have any comment on why your claims are distinguishable from the footnote two claims in Shelton. I wouldn't expect you to have thought of that, so I'm just giving you a chance to comment. Okay, and I cannot remember exactly how they are distinguishable, Judge. And I'm in my rebuttal, so thank you. All right. A couple things that I wanted to bring up that Mr. Schott will discuss. First of all, the expert report. The expert report he submitted to the court in connection with the motion for summary judgment, but there was no affidavit or no testimony. There was nothing that was attached to it to authenticate it, so it was not properly in evidence. I objected to it. The judge didn't even consider it, and it should not be considered by you because it was not properly a part of the record. Did the district court so rule? It just didn't address that point. So we have a problem ruling for the court. The court may have not considered it. Well, I mean, it shouldn't have been. My point is it should not have been considered. It wasn't mentioned by the court in her ruling on the motion for summary judgment. It was not properly part of the record, so it should not be considered by you. And even if you do look at it, it doesn't contradict the case law at all. There's nothing in that report to indicate that Dr. Magnoli was deliberately indifferent and it was just a judgment call issue. The case law clearly indicates that when there is a judgment call, it's a potential claim for negligence, but it's not deliberate indifference as a matter of law. And there's multiple cases that are cited in the brief where there are medical and health care professionals that make professional judgments, and the court has said that that doesn't rise to the level of deliberate indifference. The other issue that Mr. Schottel talked about was the affidavit of Correctional Officer Abate. What happened was in her deposition, Mr. Schottel took her deposition, and he asked her, when you looked into the cell, what did you see? And she said, you know, sitting here right now, I don't remember if he was in the cell at the time or not. It would have made sense if he wasn't in the cell because, as you pointed out, Judge Kelly, the way the system worked out is when it's time, day room hours is what we call it, recreational time, when the inmates can leave the cell, the Correctional Officer presses a button which disengages all the locks on the cells. So inmates can leave the cell at will. It's not locked from the inside, but to get back into the cell, the Correctional Officer has to release a lock. How many hours was she monitoring that day? I believe she came on duty at 2 o'clock in the afternoon, and she went to dinner at 6, came back at 7. The way that this, I will submit to you that this is. So we've got five different monitoring calls. Well. And never, couldn't recall ever seeing him in the cell. No, no, she said she saw him. She said she remembers seeing him come out in the afternoon. She came out, she remembers he, she saw him make telephone calls, she recalls that. She testified that she recalls him coming out for dinner, taking his food, and eating dinner in the recreational area. She saw him there. She testified that she saw him, and there was nothing remarkable about him. There was nothing in particular that she noticed about him, which is completely consistent with our position that this was. So the argument here is over the, after 7 o'clock. Right. Checks. Right. Check one or more, I guess one. Right. So she came back into the unit at 7 o'clock, disengaged the locks so that the inmates could leave. Mr. Hartwick left, and he called his girlfriend, Ms. Cobb, who is the mother of Plaintiff A.H. You have a recording of that telephone conversation, but you'll also know that he talked to Ms. Cobb five times that day. And they were lengthy conversations. The other thing is that the day before, Mr. Hartwick saw the physician's assistant, Todd Parker, and asked him, you know, how are you doing with your girlfriend? And he said, oh, I'm hopeful that I'll get back with my girlfriend. We're talking again, and things are going well. So Mr. Hartwick talks to his girlfriend five times on February 5th, and then after the last call, he calls his mother, Plaintiff Brenda Parrish. And you have that conversation in the record before you as well that you can listen to. And Ms. Parrish tells Mr. Hartwick that Savannah Cobb does not want to talk to you anymore. Leave her alone. Mr. Hartwick wanted to have his mother convince Savannah Cobb to come to court so that they could see each other in court and they could see each other in person. And Ms. Parrish said, no, I want you to leave her alone. She doesn't want you anymore. Get out of her life. Leave her alone. And then I did take the mother's deposition, and she testified that she didn't appreciate that he was suicidal or that there was anything particular there. So that phone call was made at 7.18 p.m. The investigative report that is in front of you, there's a police report and an investigative report. There's an inmate statement in there who says that after he saw Mr. Hartwick make a phone call and then go take a shower, we also have the statement of his cellmate who said he seemed fine, that there was nothing unusual about his appearance at that time. We know that Officer Abate made her rounds, and we know that because they have an electronic system where the correctional officer has to key in and punch a button along the way to ensure that they're doing what they're supposed to do. She testified that she looked into Mr. Hartwick's cell. She said the things that she looks for, that when you're looking into a cell, you look to see if who's there, if they're doing something that they're not supposed to be doing, if there's a safety issue. There was nothing that came to her mind. He may have been in there but certainly not doing anything that he wasn't supposed to be doing, and he may not have been in there. And if he wasn't in there, there was a good reason for him not to be in there because he was allowed out of the cell just like the cellmate was. So that was the last contact that she had with that particular cell until he was discovered at 8.15 p.m. Now something along these lines, something that bothered me because I'm not comfortable with wrongful death law. Okay. On the federal claim, I understand Judge Jackson's analysis with regard to Abate. Yes. And then she turns to the wrongful death claims and says there's immunity for the institutional defendant, Magnoli and Bernson, get official immunity also because their acts were discretionary. Correct. Then she says Abate did not breach administerial duty to conduct hourly checks. So what occurs to me is what if she was negligent in the way she did them? I would think monitoring checks of someone on precautionary status is not strictly ministerial. I mean there was no evidence at all that she was negligent in the way she monitored her checks. She testified her job is to look into the cell, you know, make sure that there's Was that argued in the summary judgment? Yes, it was. I mean I presented that in the motion for summary judgment. Did the plaintiffs articulate a negligence claim against Abate? I mean I know that they asserted a negligence claim against Officer Abate, but their claim was that she didn't monitor him. But the evidence was that she clearly did. She did her ministerial duties of checking into the cell. And there's a case, Bovner that's cited in here, Bovner v. Special School District and Stevens v. Dunn under Missouri law, which said that as long as the employee is doing their ministerial duty, which she did in this case, then there's immunity. If he wants her to do something other than do the cell checks and wants her to go beyond that and monitor her in another way, I mean monitor Mr. Hardwick in another way beyond just doing the cell checks, doing the specific ministerial duty. What's the evidence of the extent of the ministerial duty? The evidence of the ministerial duty was that she was supposed to do the hourly cell checks. And this is part of the precautionary status guidelines? Right. I mean, yes. I mean we do it for all inmates. Well, yeah, that's my point. Doing routine cell checks, I guess this is a general population facility in which some of the people are not really more monitored. Right. I understand. Okay, well then if you take the extent of monitoring, like what you want to do, that's a discretionary function. So, for example, she has discretion on what group of inmates she wants to let out of their cell to eat dinner first. That's discretionary with her. It's discretionary with her if she wants to check on precautionary inmates 20 times a shift. That's official immunity? Right. Official immunity would apply in that situation. But she was required, she had a ministerial duty to look into every cell every hour, and she did that in this case. So the only negligence liability is negligently performing the ministerial aspect of her duty. Right. And there's no evidence. She said she did it. I told you I'm not very good on rightful death law. Well, I mean, there's nothing to indicate that she didn't do it. And, frankly, it just, you know, the timing of it, we have very discrete time records showing the events that took place. So from the time, I have the number of minutes in the record that he spoke to the mother. I can't remember off the top of my head how long that was, but I do have in the motion for summary judgment the call began at 7.18 p.m. We know how many minutes he was on the phone with his mother, and then we know that she checked the cell, began her tour at 7.25. So there's just only a few minutes in there. I just have another follow-up question on the ministerial duty, and it's probably in the record, but is the duty, the ministerial duty, just checking? I mean, is there any tag on to that? And you have to report if A, B, or C is happening in the cell, or is it simply the I looked, I looked, I looked? Well, I mean, yeah. I mean, her job did require, if there was a problem, you know, if she saw Mr. Hardwick in a cell making a noose and, you know, tearing up the sheets. No, I understand that. I just wondered what the duty itself, how the duty was written in her obligations. Is that in the record we can look and see? I mean, we have the suicide prevention policy in the record, which just requires hourly checks during that particular time frame on the inmate. It seems that there are some ministerial duties that, well, and it can be debated how ministerial it is, but you look in, and if you see three people in there, you call, is a silly example. Yeah, I don't know all the ins and outs of the rules of, you know, how many people are allowed in a cell at a time. My guess is you can't. That was a silly example. I just meant once you see something. Right. You're supposed to report it to your lieutenant or report it up the chain of command if you see something inappropriate, and she did not see anything inappropriate that occurred at that time. And as far as the affidavit, I know Mr. Schadl made a big deal about affidavits and testimony. He did file a motion to strike all the affidavits. Judge Jackson denied the motion. She said the affidavits were all consistent with the deposition testimony and that there was nothing, you know, there was no contradiction there that wasn't explained in a reasonable manner. So we have that. And then I know he makes a lot out of the change of policy that happened after the fact, which is a subsequent remedial measure that we did in good faith sit down after the suicide and see if something could be done to make this so it won't happen again. And so we changed our policy in response to Mr. Hardwick's suicide.  You can't use a subsequent remedial measure to prove underlying negligence or underlying bad faith. It goes for other things. So that just shows good faith on behalf of the St. Louis County and its officials. So I have nothing else unless you have any other questions. Thank you. Mr. Schadl will have some time. Yes, he does. I'll give you a minute or two. Oh, I can move this. Sorry, you want this down? Just to be clear about C.O. Abate's ministerial duty of looking in the cells, her testimony was she glanced in Mr. Hardwick's cell and she doesn't remember anything about him, doesn't remember seeing him in the cell. All the things that my opposing counsel has stated that she did, she saw him, she remembered a lot of things about him, that was put in this subsequent affidavit. But when I asked specifically in the deposition, that's where we get the testimony that isn't as detailed. I guess that's what Judge Jackson had found when I filed the motion with respect to the supplemental affidavit. But also, Correctional Officer Abate, not only did she know that Mr. Hardwick was on precautionary status, but she also knew of the hitting of the head incident because she happened to be, just by chance, working on that floor where he was that day. So in analyzing these claims, the focus is on what the defendants knew with respect to the particular individual. So I wanted to make sure to point that out to the court. If there are no more questions, thank you. Thank you, counsel. The case has been carefully briefed and argued, and we'll take it under advisement. Thank you. Please call the last case for argument. The last case for argument is Stewart v. Kelly. Mr. Byrd. May it please the court.